2008-NMCA-096

188 P.3d 1273

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Julien Holt WILLIAMSON, Defendant–Appellee.**

No. 27,193.

Court of Appeals of New Mexico.

May 28, 2008.

Certiorari Granted, No. 31,174, July 21, 2008.

Gary K. King, Attorney General, Santa Fe, NM, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Appellant.

The Jones Witt Law Firm, S. Doug Jones Witt, Roswell, NM, for Appellee.

## OPINION

ALARID, Judge.

{1} The State appeals from the district court's order suppressing evidence seized pursuant to two search warrants. The district court, relying on the Fourth Amendment of the United States Constitution and Article 2, Section 10 of the New Mexico Constitution, ruled that the initial warrant was not supported by probable cause and that the items seized pursuant to the second warrant were the fruits of the illegal search pursuant to the initial warrant. We affirm.

{2} We review the district court's order under the standards set out in *State v. Nyce,* 2006–NMSC–026, ¶ 8, 139 N.M. 647, 137 P.3d 587. The affidavit submitted in support of the first warrant is the focus of our analysis. *Id.* (observing that review of a magistrate's determination of probable cause "is limited to the contents of the affidavit"). We set out the contents of the affidavit below.

### AFFIDAVIT FOR SEARCH WARRANT

. . . .

PERSON and or DESCRIBE PREMISES:

cardboard box containing vacuum sealed plastic bag which contains two packages wrapped in gray in color duct tape. Currently located at the UPS store at 111 E. College[,] Roswell, Chaves County New Mexico[.]

SET FORTH NAME OF PERSON OR DESCRIBE PROPERTY:

Any controlled substance to include but not limited to marijuana, cocaine, heroin or methamphetamine. Any documents or papers showing the name of Julian [sic] aka Holt Williamson. Any items of narcotic paraphernalia used to weigh, ingest, or distribute controlled substances.

1. Affiant is Sergeant Eric Brackeen, # 132, a certified law enforcement officer with eleven (11) years of law enforcement experience. Affiant is cur-

rently assigned to the Chaves County Metro Narcotics Task Force Division of the Roswell Police Department, Roswell, Chaves County, New Mexico.

2. Unless otherwise noted, all locations mentioned in the Affidavit are in Roswell, Chaves County, New Mexico.

3. That on Tuesday October 25, 2005[,] Affiant resonded [sic] to the UPS store located at 111 E. [C]ollege in reference to a suspicious package.

4. That upon arrival, Affiant contacted store manager Jennifer Ary. That Ms. Ary stated that on today[']s date a subject entered the store at approximately 12:49 p.m. and wanted to send a package to a Jesse Gomez in Brooklyn[,] New York. That the subject sending the package was identified as a Holt Williamson, and that when asked what was in the package to be sent, Mr. Williiamson [sic] first stated that he did not know. That he was then advised that the package would then have to be opened, and he then stated that there was a book inside the box, and that he was sending it to his son. Ms. Ary stated that Mr. Williamson has mailed packages from this store before, but that this was the first time he appeared nervous and stated he did not know what was in his package.

5. That Affiant then learned from Ms. Ary that she did not feel right about the package, and that after Mr. Willimson [sic] left she opened the box. That inside the box she found a clear plastic bag that appeared to be vacuum sealed. That inside the bag was two containers, each wrapped with gray tape. That Affiant did then look at the bag and containers, and observed a Crystal Light cylinder container wrapped with gray duct tape, and a square Ferrero candy box also wrapped on the ends with gray duct tape.

6. That Affiant did notice that the Cyrstal Light container was crunched in, apparently from the bag being vacuum sealed. That Affiant did then have K-9 handler Detective Jimmy Preston bring Police Servic [sic] Dog Coro, a narcotics detection dog, to the business, and have Coro check the bag. Coro did check the bag, but did not indicate a positive response for the presence of narcotics.

7. Affiant knows from traning [sic] and experience that often times narcotics are packaged in unusual containers, wrapped with duct tape, and vacuum sealed, to make the narcotics less detectable by narcotic detection canines. Affiant also knows from training and experience that narcotics are often mailed to other places using carriers such as UPS.

8. Affiant believes from the above information, that proable [sic] cause does exist to issue a search warrant for the above mentioned package.

{3} Based on the information contained in the affidavit, a district court judge issued a search warrant authorizing a search of the contents of the package and its contents. Pursuant to the warrant, law enforcement officers opened the inner packages and discovered a quantity of marijuana. Relying on the results of the first search, the Affiant applied for, and obtained, a second warrant authorizing the search of Defendant's home. In the ensuing search, officers discovered additional drugs as well as drug paraphernalia. Defendant was charged by criminal information with felony possession of marijuana with intent to distribute and misdemeanor possession of drug paraphernalia. Defendant moved to suppress the evidence seized in the two searches.

{4} The district court reasoned that the circumstances existing prior to the dog sniff were sufficient to establish reasonable suspicion that the plastic bag contained drugs, and that had Coro alerted, probable cause would have been established. However, Coro did not alert. The district court relied on the common-sense proposition that if a positive response from a narcotics detection dog can establish probable cause to believe that illegal drugs are present, then a negative response can fatally undermine the case for probable cause. The court stated that "[i]t is

just not tenable to allow the State to pick the times when the dogs are to be accepted and the times when they are to be rejected." Thus, in the district court's view, Coro's failure to alert "refuted and even eliminated" any reasonable suspicion otherwise established by Defendant's suspicious behavior and by the vacuum-sealing and duct-taping of the contents of the package, leaving the Affiant with "nothing more than bare speculation based upon Defendant's suspicious conduct and his use of common, legal materials."

{5} Although it is well settled that an alert by a reliable narcotics detection dog is sufficient to establish probable cause that drugs are present, *State v. Snyder*, 1998–NMCA–166, ¶ 9, 126 N.M. 168, 967 P.2d 843 (discussing Tenth Circuit precedent); *State v. De Jesus–Santibanez*, 119 N.M. 578, 582, 893 P.2d 474, 478 (Ct.App.1995), to our knowledge no New Mexico appellate decision has independently and critically examined the reliability of canine narcotics sniffs. *See generally* Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog*, 85 Ky. L.J. 405, 416–18 (Winter 1996–97) (discussing canine reliability jurisprudence); Jeffrey S. Weiner & Kimberly Homan, *Those Doggone Sniffs Are Often Wrong: The Fourth Amendment Has Gone to the Dogs!*, 30–APR Champion 12 (2006) (examining the reliability of dog sniffs from the viewpoint of the criminal defense attorney; questioning judicial acceptance of the "entrenched myth of the infallible canine"). No reported New Mexico appellate decision has discussed what evidence, if any, regarding the experience and reliability of a particular narcotics dog-handler team must be set out in an affidavit for a warrant in which a positive alert by the dog is the primary ground for supporting probable cause, and no New Mexico appellate decision has discussed what evidence would justify a judge reviewing an application for a search warrant in disregarding or discounting an apparently reliable narcotics detection dog's failure to alert.

{6} In *Florida v. Royer*, the Supreme Court made the following observations regarding canine drug sniffs:

The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, [the suspect] and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. *A negative result would have freed [the suspect] in short order;* a positive result would have resulted in his justifiable arrest on probable cause.

460 U.S. 491, 505–06, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (emphasis added) (footnote omitted). Elsewhere in the Supreme Court's opinion, the Court noted apparently uncontradicted testimony by the investigating officers that the suspect's "appearance, mannerisms, luggage, and actions," including noticeable nervousness, fit a "drug courier profile." *Id.* at 493, 103 S.Ct. 1319 (internal quotation marks omitted). The Court's remarks indicate that the Court viewed a negative response by a narcotics dog as inconsistent with the existence of reasonable suspicion of possession of narcotics, notwithstanding the suspicious circumstances observed by the investigating officers. We ourselves recently observed that "the officers' use of a drug dog was a means of investigation that would *dispel or confirm* their suspicions quickly." *State v. Robbs*, 2006–NMCA–061, ¶ 29, 139 N.M. 569, 136 P.3d 570 (emphasis added); *see also State v. Neal*, 2007–NMSC–043, ¶ 43, 142 N.M. 176, 164 P.3d 57 (Bosson, J., dissenting) (stating that if a drug dog fails to alert, a motorist detained on suspicion of narcotics offense is "free to go"). In two cases suppressing evidence seized following an investigatory stop of a vehicle, the failure of a narcotics detection dog to alert appears to have been a factor in our conclusion that the subsequent extended detention of the subjects amounted to a de facto arrest without probable cause. *State v. Hernandez*, 1997–NMCA–006, ¶¶ 5, 26, 122 N.M. 809, 932 P.2d 499; *State v. Flores*, 1996–NMCA–059, ¶¶ 3, 12–14, 122 N.M. 84, 920 P.2d 1038.

{7} Proponents of the use of a narcotics dog report success rates well above ninety percent. Bird, *supra*, at 425; *see, e.g., United States v. Davis*, 430 F.3d 345, 356 (6th Cir.2005) (citing testimony of dog's handler that drug-sniffing dog's success rate at detecting narcotics was "over ninety percent"); *Jacobson v. $55,900 in U.S. Currency*, 728 N.W.2d 510, 515 (Minn.2007) (citing testimony of dog's handler that in 2,100 "training sniffs" dog had an error rate in training of no more than one to two percent). If narcotics detection dogs in fact are extremely reliable in discriminating narcotics from other substances, then an unexplained failure to alert will significantly, and in marginal cases may fatally, undermine an otherwise sufficient showing in support of a warrant. "The failed drug sniff is exactly the type of evidence that tends to undermine the conclusion of the presence of drugs. It is a negating factor that has a substantial impact on the determination of probable cause, and cannot be lightly ignored." *Longshore v. State*, 399 Md. 486, 924 A.2d 1129, 1156 (2007); *accord United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir.1993) (internal quotation marks omitted) (observing the fact that a narcotics dog failed to alert to package suspected of containing drugs would have been "clearly critical" to the determination of probable cause; holding that the omission of information that a narcotics dog had failed to alert in an application for a search warrant constituted reckless disregard for the truth under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). Conversely, if narcotics detection dogs are so unreliable that their failure to alert can be dismissed by a judge without engaging in a case-specific examination of why the dog failed to alert, then we question whether courts should routinely rely on alerts by narcotics detection dogs to support a finding of probable cause.

■ {8} We think that it was reasonable for the issuing judge to infer from the UPS clerk's report of Defendant's nervousness and evasiveness that Defendant did not want to disclose the contents of the package to the clerk, a circumstance that supports the further inference that Defendant believed that identifying the contents would be either embarrassing or incriminating, or would result in UPS rejecting the package. The strength of an inference that the contents were incriminating was reinforced after the package was opened by the clerk, permitting the observation of the contents packed in a manner known by the Affiant to be consistent with the practice of drug traffickers.[1] However, after Coro failed to alert, and in the absence of a satisfactory explanation of why Coro failed to alert, the inference that the package contained drugs was significantly dispelled. At that point it was still reasonable for the Affiant to suspect that the contents were incriminating (e.g., child pornography, counterfeit currency, or stolen property) or embarrassing (e.g., non-obscene sexually explicit matter), but in the absence of information making it reasonably likely that Coro's failure to alert was a false negative rather than a valid non-alert, "[t]he failed drug sniff [was] exactly the type of evidence that tends to undermine the conclusion of the presence of drugs [ ] ... and cannot be lightly ignored." *Longshore*, 924 A.2d at 1156.

■ {9} In the present case, the Affiant properly disclosed that Coro had failed to alert. However, the only statement in the affidavit that arguably bears on Coro's failure to alert is the Affiant's statement that "Affiant knows from traning [sic] and experience that often times narcotics are ... wrapped with duct tape, and vacuum sealed, to make the narcotics less detectable by narcotic detection canines." We do not understand the Affiant's statement that narcotics are wrapped and vacuum sealed by drug traffickers "to make the narcotics less detectable" as principally an expression of the Affiant's opinion that duct-taping and vacuum-sealing explained Coro's failure to alert; rather, we understand this statement principally as a description of the practice of drug traffickers who commonly believe (rightly or wrongly) that vacuum-sealing will make nar-

---

1. did not claim in the district court, and does not argue on appeal, that his constitutional rights were violated by the opening and initial deten-

tion of the package by the privately employed clerk.

cotics less detectable.[2] The Affiant's reference to duct-taping and vacuum-sealing appears to us to have been intended by the Affiant to show how facially innocuous circumstances known to the Affiant combined with his knowledge and experience as a law enforcement officer to support a reasonable suspicion that the package contained illegal drugs. *See, e.g., United States v. Dennis,* 115 F.3d 524, 532–33 (7th Cir.1997). Furthermore, we do not view the effectiveness of vacuum-sealing drugs in masking the scent of drugs from narcotics detection dogs as sufficiently settled such that a court can take judicial notice of the effectiveness of this method of masking. To be the subject of judicial notice, "[t]he matter must be known, that is well established and authoritatively settled [;] ... uncertainty of the matter or fact in question will operate to preclude judicial notice thereof." *Rozelle v. Barnard,* 72 N.M. 182, 183, 382 P.2d 180, 181 (1963) (discussing prerequisites to judicial notice of a matter). The unsettled state of knowledge with respect to the effectiveness of vacuum-sealing is demonstrated by reported cases describing instances where narcotics detection dogs have alerted to drugs notwithstanding efforts to mask the scent of drugs by vacuum-sealing the drugs in plastic. *E.g., United States v. Reyez,* 183 F.App'x 755, 756–57 (10th Cir.2006) (unpublished) (citing evidence that narcotics dog alerted to methamphetamine sealed in layers of tape, oil, plastic wrap, and mustard, with inner layer vacuum sealed); *United States v. Knox,* 193 F.App'x 780, 781 (10th Cir.2006) (unpublished) (order & judgment) (citing evidence that a narcotics dog alerted to two suitcases containing twenty bundles of marijuana wrapped in duct tape and vacuum sealed in plastic bags). Thus, in the absence of a more definite and detailed explanation for why Coro failed to alert, the fact that the contents of the package were vacuum sealed did not of itself justify dismissing the strong negative inference arising from Coro's failure to alert.

{10} Setting aside Coro's failure to alert for the moment, we think that the remaining circumstances set out in the affidavit, though certainly suspicious, were insufficient under controlling precedent to demonstrate probable cause to believe that the contents of the package were illegal drugs. Our Supreme Court has stated that the probable cause inquiry should be "particularly exacting" when the conduct observed by an officer is consistent with lawful activity, and this is so "regardless of an officer's qualifications and experience." *Nyce,* 2006–NMSC–026, ¶ 14, 139 N.M. 647, 137 P.3d 587. Suspicious, but facially lawful, behavior "should be the beginning, not the end, of the investigation." *Id.* ¶ 22. There was no indication that Defendant was known to the Affiant, a member of the local narcotics task force, to be involved with illegal drugs. There is no indication in the affidavit that the Affiant checked law enforcement databases to determine whether Defendant had prior arrests or convictions for drug-related offenses or that the Affiant otherwise attempted to develop information linking Defendant or the addressee to illegal drugs. The Affiant did not attempt to speak with Defendant's neighbors, nor did he attempt a "knock and talk." Applying *Nyce* and the following cases, *State v. Anderson,* 107 N.M. 165, 169, 754 P.2d 542, 546 (Ct.App.1988), *State v. Zelinske,* 108 N.M. 784, 786–88, 779 P.2d 971, 973–75 (Ct. App.1989) (holding that officer's observation of heavily taped detergent box coupled with odor of deodorizing agent and suspect's withdrawal of consent to further search did not supply probable cause to believe that detergent box contained illegal drugs) *overruled on other grounds by State v. Bedolla,* 111 N.M. 448, 806 P.2d 588 (Ct.App.1991), and *Flores,* 1996–NMCA–059, 122 N.M. 84, 920 P.2d 1038, we hold that the facts known to

---

**2.** We have no information as to how likely it is that the Defendant could have placed packages of marijuana inside the plastic bag prior to vacuum-sealing the bag without leaving trace amounts on the exterior of the bag sufficient to trigger an alert by a trained narcotics detection dog. Similarly, we do not know the extent to which plastics used in vacuum-sealing are permeable to the chemicals in marijuana that trigger an alert by a narcotics detection dog. During the hearing on the motion to suppress in this case, the State represented to the district court—apparently as a matter of common knowledge among law enforcement officials—that drug traffickers "believe erroneously" that wrapping drugs in duct tape and vacuum-sealing the drugs will mask their odor from narcotics detection dogs.

the Affiant prior to the dog sniff did not constitute probable cause to believe that the contents of the package were illegal drugs.

{11} To summarize, the facts known to the Affiant prior to the dog sniff did not rise to the level of probable cause to believe that the contents of the package were illegal drugs. This already insufficient showing was substantially undermined by Coro's failure to alert. Accordingly, we agree with the district court that the affidavit presented to the issuing judge did not establish probable cause to search the contents of the inner vacuum-sealed package.

{12} As previously noted, the results of the search of the package were used to obtain a warrant for the search of Defendant's home. The district court ruled that the evidence seized during the search of Defendant's home should be suppressed as "fruit of the poisonous tree secured from the original search warrant." The State does not separately appeal this ruling which therefore stands as the law of the case.

{13} The order of the district court suppressing evidence is affirmed.

{14} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

JONATHAN B. SUTIN, Chief Judge (dissenting).

SUTIN, Chief Judge (dissenting).

{15} I respectfully dissent. I would reverse and hold that the district court search warrant relating to the two packages at the UPS store was based on probable cause. The district court judge issuing the warrant determined that the officer's affidavit established probable cause for issuance of the search warrant.

{16} Were no narcotics detection dog involved in this case, the majority would have to decide whether the circumstances without canine involvement were sufficient to establish probable cause for the search warrant. Wording in the majority opinion aside, it is clear to me that the majority must be of the

view that the circumstances would be sufficient were there no alert failure,[1] since the majority goes out of its way to determine that the alert failure negates probable cause. Otherwise, if the majority viewed the circumstances, absent the alert failure, as insufficient to establish probable cause, the district court's suppression order would be affirmable, leaving the majority with no reason to address the significance of the alert failure. In my view, the issue is whether the majority should even have considered alert failure. For reasons actually set out in the majority opinion, I do not think so.

{17} It appears that in prior decisions this Court has given strong presumptive weight to a dog alert, such that an alert alone can establish probable cause. *See State v. De Jesus–Santibanez*, 119 N.M. 578, 582, 893 P.2d 474, 478 (Ct.App.1995) (stating that a dog alert "gave the officers probable cause to search the vehicle"); *State v. Kaiser*, 91 N.M. 611, 615, 577 P.2d 1257, 1261 (Ct.App. 1978) (Wood, C.J., concurring in part and dissenting in part, with Hernandez, J., specially concurring in C.J. Wood's statement) (stating that the accuracy of detection of marijuana by a dog not being contested, "[t]he detection . . . in itself, provided probable cause for [the] defendant's arrest"). However, as the majority indicates, the cases do not contain a critical examination of the reliability of dog sniffs and alerts for probable cause determination purposes. We have noted that the Tenth Circuit has consistently held that "an alert by a dog that is properly trained and certified in the detection of illegal drugs is sufficient to establish probable cause for a warrantless search." *State v. Snyder*, 1998–NMCA–166, ¶ 9, 126 N.M. 168, 967 P.2d 843. Because of the reliability given to a dog alert and based on articles and foreign case law indicating low error rate, the majority gives strong presumptive weight to the failure to alert. With that presumptive weight in hand, the majority holds that without a satisfactory explanation for the alert failure, the failure must be given such strong and substantial weight as to require

---

1. The officer stated and the district court judge that issued the warrant found that the "narcotics detection dog . . . did not indicate a positive response for the presence of narcotics." I will refer to this as a failure to alert or as an alert failure.

the conclusion that the district court judge in the present case erred in determining that probable cause existed to issue the search warrant. I do not think that the record is sufficiently developed in this case for that holding. I acknowledge that the defendant has no opportunity at the time a warrant is sought and issued to create any sort of record. But the police officers do have that opportunity, and the magistrate judge or district court judge can require a more complete record, as I discuss later in this dissent.

{18} I do think that the State has the burden to explain an alert failure, if it can, and the failure to satisfy that burden ought to be a part of the mix in considering the evidentiary sufficiency for probable cause for a search warrant. But how do we determine the weight to be given to an unexplained alert failure? In the present case, there exists no evidence in the record, including any sort of case-specific evidence of reliability, that would support a conclusion as to the meaning, significance, or weight to be attached to a failure to alert. There is only a strong presumptive weight now given by the majority to a failure to alert, based for the most part on this Court's previously unexamined presumptive reliability and weight given to an alert.

{19} There is a certain reasonableness in the majority's thinking that, if we are to give strong presumptive weight to a dog alert without having made a critical examination of the reliability generally or even specifically of canine narcotics sniffs and alerts, *see* Majority Opinion ¶ 5, we ought to be able to give the same strong presumptive weight to an unexplained alert failure. The majority, therefore, does raise a valid question, namely, that "if narcotics detection dogs are so unreliable that their failure to alert can be dismissed by a [district judge] without engaging in a case-specific examination of why the dog failed to alert, then we question whether courts should routinely rely on alerts by narcotics detection dogs to support a finding of probable cause." Majority Opinion, ¶ 7.

{20} But I am concerned whether the record in this case or the status of the law in New Mexico presents this Court with the prerogative of choosing to apply the weight it does to negate probable cause. If general applicability of underlying evidence of reliability is missing in New Mexico law, and if case-specific evidence of reliability is missing in the particular case before the Court, I do not think that it is particularly wise or useful to attempt to engage in a weight application as the majority does here. I would prefer a more developed record on which to examine the reliability of, and to determine the weight to be given to, alerts and alert failures, before we venture into presumptive standards or into weighing an unexplained alert failure for probable cause determinations.

{21} Thus, in deciding the present case, as the record stands I would not give such weight to the alert failure as to negate probable cause. We should await cases with better records on reliability before venturing into a full-scale analysis and decision as to weight as the majority has done in the present case.

{22} In the present case, the UPS store manager knew who Defendant was. He had mailed packages from the store before, but this was the first time he appeared nervous and stated that he did not know what was in the package. Several circumstances create more than a reasonable suspicion of criminal conduct. These include Defendant's nervousness, his inability or unwillingness to state what was in the package, his later recollection that a book was inside when the store manager said that the package would have to be opened, his statement that he was sending the package to his son when the addressee's last name was different than Defendant's last name, the store manager's obvious suspicions, the packaging indicating that Defendant was likely lying to the store manager, the store manager's fairly obvious training and her behavior in regard to suspicious use of common carrier delivery for drug activity, and the officer's generally expressed training and experience.

{23} Furthermore, the officer stated that the UPS store manager observed two containers inside a vacuum sealed bag, each wrapped with duct tape; that the officer himself observed the bag and also a Crystal Light cylinder wrapped with gray duct tape

and a square Ferrero candy box also wrapped on the ends with gray duct tape; and that the officer knew from training and experience that "often times narcotics are packaged in unusual containers, wrapped with duct tape, and vacuum sealed, to make the narcotics less detectable by narcotic detection canines" and also that "narcotics are often mailed to other places using common carriers such as UPS." Majority Opinion, ¶ 2.

{24} Thus, in my view, the affidavit of the officer contained enough information for a probable cause determination. With no evidence and standards yet developed as to the weight to be given to an alert failure, I have difficulty giving any particular weight to the alert failure, much less the weight given by the majority in negating probable cause established by the other circumstances. Before requiring district court and magistrate court judges in the future to give a particular presumptive weight to an unexplained alert failure, I would like better developed facts and studies by the parties in an evidentiary hearing. Also, it would seem that, at the very least, an affidavit relating to the dog and its handler showing successful and unsuccessful alert rates and relevant characteristics of the dog in that regard and in regard to its reliability might go far in assisting judges who are asked to issue search warrants.

{25} The experience and training of police officers and of the common carrier or mail employees should be a probative ingredient in the probable cause analysis. It is clear that we "look to the totality of the circumstances to determine if probable cause is present," and "we give deference to a magistrate's decision, and to an officer's observations, experience, and training[.]" *State v. Nyce*, 2006–NMSC–026, ¶¶ 10–11, 139 N.M. 647, 137 P.3d 587. In the present case, the circumstances are not "completely innocent in themselves." *Contra State v. Zelinske*, 108 N.M. 784, 787, 779 P.2d 971, 974 (Ct.App. 1989), *overruled on other grounds by State v. Bedolla*, 111 N.M. 448, 806 P.2d 588 (Ct.App. 1991). Nor should they be considered gener-

ally descriptive of the circumstances involving hundreds of innocent persons sending packages by a common carrier. *See id.* (stating, with regard to a search of a container in a vehicle, the facts relied on for probable cause were "used much more frequently for entirely innocent purposes than for transporting narcotics" and citing *State v. Anderson*, 107 N.M. 165, 169, 754 P.2d 542, 546 (Ct.App.1988), for the proposition that the "facts relied on as part of drug courier profile were generally descriptive of hundreds of innocent persons traveling throughout New Mexico on the interstate every day").

{26} While the affidavit should have been a bit more specific in regard to the officer's training and experience, the general statements of his training and experience, as well as Defendant's very suspicious behavior of indicating first that he did not know what was in the box and, after being told that the package would have to be opened, stating that a book was in the box, and the UPS store manager's and officer's observations of the actual contents, tip the scale in my view in favor of probable cause despite the lack of details of the officer's specific training and experience. I have no problem deferring to the judgment of the district court judge who issued the search warrant. I am not prepared in this particular case to apply weight to the alert failure with the consequence of negating sufficiency of the facts which support probable cause.

{27} In conclusion, because I think that the circumstances objectively and reasonably are sufficient to constitute probable cause for the issuance of the district court search warrant notwithstanding the alert failure, I would reverse the district court's grant of Defendant's suppression request.